When you're ready, you may proceed. May it please the Court, my name is Bill Moorman. I represent the appellants in this case. As your Honors well know, this is the second time that this case has been before this Court, and therefore I'm not going to go back into the facts and a lot of the details of what happened below, but what I want to do here in my argument today is emphasize four points. One, that on the facts of this case, because it deals with a ballot question, we don't believe you even get into strict scrutiny analysis, that under Supreme Court doctrine the state simply can't regulate the speech at issue here. Two, this Court's prior ruling finding that, first of all, that false speech is not exempt from First Amendment protection was confirmed by the U.S. Supreme Court in the Alvarez case, and the Alvarez case also did not undermine this Court's finding that the restriction at issue here is subject to strict scrutiny. Counsel, on that point I don't get it, because there are only four votes in the Supreme Court for strict scrutiny, right? That's true. And we last time said strict scrutiny, right? Yep. It had to undermine us, right? What? It had to undermine us, correct? No, I'm ahead, 4-2. You only got two votes for immediate. I'm saying that somewhat jokingly. I think you are, but now help me with how we can apply strict scrutiny in this case. I can help you very easily. Alvarez has two holdings to it. One, consistent with this Court's opinion, false speech is not exempt from First Amendment protection. And two, the Stolen Valor Act is unconstitutional. That's it. The argument that the respondents make here that the two-vote concurrence is some kind of controlling opinion in this case, which deals with political speech at the core of First Amendment protection, is absurd. And, in fact, it's also inconsistent with Justice Breyer's concurrence. Justice Breyer specifically stated in his concurrence, As the defense points out, there are broad areas in which any attempt by the State to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like raise such concerns and in many contexts have called for strict scrutiny. That's Justice Breyer. So what the respondents would have this Court do is something that would be completely incongruent with First Amendment free speech analysis. It would have this Court apply intermediate scrutiny to speech that's at the very top of protection for First Amendment, political campaign speech. There's a plethora of Supreme Court decisions that say that. Then the Court would go and apply strict scrutiny to somebody going out and saying that Picasso painted the Sistine Chapel, which isn't at the core. And then we would go back down to intermediate scrutiny for something like the Stolen Valor Act. That's absurd. And I would also point out that in the dissent, which Justice Breyer noted that he agreed with, the dissent said that prohibitions on false speech regarding the same areas that Justice Breyer cited, plus areas of public concern, which would include political speech, would be unacceptable. And the problem is, as we've seen in this case, is the concern that the Supreme Court has had and that this Court had in its original decision of having a jury or a court or the government or the respondents become the arbiter. An administrative agency. Or an administrative agency become the arbiter. Are there any other cases where an administrative agency is ruling on free speech like this? No, this is some goofy deal. Now wait, Ohio has a similar law. They do, you're correct. Okay, now, does the Ohio law have an administrative agency in it, to start with that? They do. Okay, so it's not that goofy. Go ahead. Okay, so, but I don't, my recollection, I'm not going to represent that I fully understand this. I've read a little bit of it because of the case the Court's referring to that's going up on cert, which I want to emphasize the two questions it's going up on relate to standing alone. There's been no question presented in that case to deal with whether or not substantively the statute's constitutional. It's going up on standing. And by the way, the Sixth Circuit is an outlier on standing. In fact, that opinion is just breathtaking. We'll find out. Go ahead. Yeah. So, anyway, in Ohio, apparently this commission makes a probable cause finding, and then my recollection is that once the probable cause finding is made, then it gets referred to prosecutors, and the prosecutors can decide whether to prosecute or not. Minnesota, I think, is different because the administrative panel can find you. Yes, and the administrative panel, are these governor-appointed officials? Who appoints the panel? Yeah, the panel, the entire administrative court is appointed by the governor, and it's an executive branch court. And they have limited tenure, like three or five years or something like that? I'm not sure about that, but they all get reappointed. I don't know of anybody who's gotten. Yes, but they have limited tenure. Yes. That's my sense. And I've tried a number of cases to that court, and I just feel because of my own sense of the First Amendment that I just feel I'm almost in a star chamber sometimes arguing these cases because you have disputes about political speech, and I'm trying to convince members of a court what's truthful about the effects, the future effects of a ballot question. And I had one case where I was representing Mr. Niska, where he was alleged to have made a statement about what was going to happen with the teachers' unions, and the people who complained about it brought up an expert, and his first statement of the expert was, well, the statement by Mr. Niska was literally true, but you have to look at it in this context. And I, of course, got up and asked the witness one question, a statement true or not. He said yes, and I rested my case, and it was dismissed. But Mr. Niska had to pay me $1,500 to do that. He's a grassroots activist. He doesn't want to be subjected to that. Counsel, going back to Ohio, now, CERT was petitioned for in our case and denied by the Supreme Court. Correct. Then now the issue, as far as I understand the 28J letter, is that the Ohio court differed with us, and so now the Supremes have granted CERT to find out if to pass on the question as to whether our rationale that they didn't grant CERT on, which has been kicked in the creek, so to speak, by the Sixth Circuit, will pass muster in the Supreme Court. Isn't that correct? Only on standing. Only on the standing issue. And I confirmed that with petitioners' counsel in Washington. I see. There's two questions that went up. One was the standard that the Sixth Circuit utilized, and the second question was whether or not a party in my client's position has to admit that they're going to make false statements in order to have standing. Well, notwithstanding this stolen valor thing, the district court purportedly applied strict scrutiny in this case. Is that right? They said that. But they applied it contingently as an alternative. The district court said you apply intermediate scrutiny. It had passed muster under both standards. Yes, that's what they said. I just want to emphasize, really emphasize, that Marx just doesn't apply. Marx doesn't apply here because of what Breyer said. Breyer said there would be situations that strict scrutiny would apply, and if it's going to apply, you'd think it would apply right at the core. And then secondly, under Marx, you don't look at the outcome of the case to figure out what the narrower standard is. You look at the standards themselves. Well, counsel, it does say who concurred in the judgment. Your adversary brief made that mistake, too, and you did earlier. The Marx test clearly says you look at only the judges who concurred in the judgment in that case, justices who concurred. Correct? That's correct. That leaves the dissenters out. That leaves the dissenters out. Okay, good. But then what you look for are the standards that the concurrence and plurality looked at in the case. And in this case, what the district court did was an outcome-based analysis. They said that something that would satisfy strict scrutiny would always satisfy intermediate scrutiny. Well, that's only true if you win. If you lose, it's the opposite result. What I'm saying is you don't look at it based on what the result was. You look at the standard, and the standard is compelling state interest versus substantial state interest. Every interest that's compelling will always be substantial, but not all substantial interests will be compelling. And that's basically the analysis this court did in the Farkas case when it looked at the Barnes decision on nude dancing and we had a disagreement between Justice Souter and the plurality regarding the second factor in that case of whether the state needed to prove that the nude dancing ordinance would protect the morals or whether they had to be at secondary effects. And your analysis had nothing to do with the outcome of the case. It simply said that Souter's finding that secondary effects would be encompassed within the standard on morals. Counsel, before you sit down, does the inclusion of an actual malice standard preserve this statute? Does that make it more narrowly tailored to meet strict scrutiny? No, and, in fact, this court in its prior decision specifically noted that in the political context, that's going to be really difficult to apply. The court stated, this court held that we persuasively argue that deciding whether a statement was made with reckless disregard for the truth in the political speech arena often proves difficult. I would also argue that it doesn't narrowly tailor anything because that intense standard is always going to be based on subjective, circumstantial evidence because any time you go into court, the party is alleged to have intentionally done something, denied it, and the only way to prove it is through circumstantial evidence. I'm cutting into my reply time. Thank you. Thank you, Counsel. Mr. Rogin. Thank you, Your Honor. May it please the Court, I'm Dan Rogin. I'm representing the two county attorneys in this matter, Attorney Freeman and County Attorney Arneson. There is not a constitutional right to intentionally lie to voters to induce them to vote in a particular way. Minnesota's law prohibiting calculated lies in campaign material designed to trick voters into voting in a particular way satisfies First Amendment scrutiny. Well, it may, or on the other hand, it may be permitting people to chill the speech of their opponents by claiming that something, or there's plenty of law that says that in political speech, untrue statements are protected speech. True, Your Honor. There are dozens of cases. There are dozens of cases, and the reasons that we protect some false speech is not because we're trying to protect calculated lies. The reason that the Court does that is to provide breathing space so that we can have a robust debate where people don't have to be concerned about the inadvertent lie. Counsel, your argument is that this does not limit First Amendment speech. Our argument is that under Alvarez, this Court should apply intermediate scrutiny, and the statute survives intermediate scrutiny because it's narrowly tailored to focus on only those calculated lies that are not, that the First Amendment allows. Alvarez wasn't political speech. Alvarez was not political speech, but it was the first time the Supreme Court analyzed a false speech statute and said that, and specifically said that we're going to apply scrutiny to false statement statutes. Because, and the reason that this intermediate scrutiny argument is specious is that you either, all you need to do is call a registry in Washington and you know whether somebody has earned the Medal of Honor or not. And so what you're doing here is you're turning loose the opponent, turning loose this rule on people who want to combat your money or whatever you're trying to seek, your ballot questions, and keep them out of the political arena by having to pay $1,800 to represent themselves or get them represented, whether or not, even when they do have the right to say things that are not necessarily true. Your Honor, I would disagree. I think that the statute and intermediate scrutiny is designed to make sure that Minnesota statute only proscribes calculated lies, that it doesn't get to false statements that are not calculated, and that it's narrowly tailored. And that's what the intermediate scrutiny is designed to do, is to make sure we have a substantial government interest and that it's tailored to that interest. This rule is both over-inclusive and it's under-inclusive. You limit it to, you permit paid political publication, advertising, but what you're limiting here, you say, is when somebody's on the campaign stump and they say something off the cuff. Well, I suspect that the Republican candidate for the presidency last time, who was recorded saying 47% of the people give government money, that lived, and President Obama says you can keep your insurance if you like it, period. So things like that live just as long as the stuff that's printed. Your Honor, they don't involve the same calculation when somebody's sitting down to write down a campaign flyer that they're going to send out. Yeah, so many of those comments are written. That's a specious suggestion. Well, they may be written, but, Your Honor, the idea is to provide breathing space. Let me ask you, let's change the subject for just a moment. What really troubles me is this goes to an administrative agency of the state with people appointed by the governor, a political actor with limited terms, a Mickey Mouse court. How can you defend that? Your Honor, it's not a Mickey Mouse court. That doesn't meet any level of scrutiny. Your Honor, it's not a Mickey Mouse court. It's the Office of Administrative Hearings. They are the administrative body for the state of Minnesota. They hear a whole host of things, including rules. They hear employment cases. And in this case, the burden is on the proponent to prove by clear and convincing evidence. And if it gets past the Office of Administrative Hearings, there's a right to appeal to the Minnesota Court of Appeals. So I would not characterize the Office of Administrative Hearings as a Mickey Mouse court. Are they appointed by a political official? They are. What is their term of tenure? They are appointed by the governor, and I do not know the tenure. Is it a limited tenure? Yes. Are they subject to removal by the governor for cause? For cause, I believe so. Yes, they're subject to removal by an official for cause, why we rebelled against England in 1776. Your Honor, I would just argue that the Office of Administrative Hearings is a body that is used in Minnesota for a whole host of matters, not just related to this campaign speech. This is just one of the areas that they are on. Speech is like anything else in Minnesota. It's like any other garden variety issue, right? And political speech is like any other garden variety issue. That's what you're telling us, right? No, I would not. You just said it. No, if I said that I misspoke, I would not say that political speech is like any other garden variety issue. I would say that the matters that come before the Office of Administrative Hearings are a variety of ones, and the state of Minnesota has determined that it's a body that should hear these cases. It decided that in 2004, and I would just point out your Honor. The governor heard these. Could they be brought before the governor or a cabinet official? Could the complaint be brought to them? Not under our statute. No, excuse me. Legally, could it be done under your logic? No, Your Honor. Why not? Because it needs to be a judicial figure. No, wait, wait, wait. Didn't you just tell me this board is in the executive branch, and they're removable by the governor for cause? Yes, Your Honor. Okay. Well, you just said judicial. They're not a judicial agency, correct? They're all judges, Your Honor. Yes, they are. In the executive branch of government? Yes, they are, Your Honor. I said are they in the judicial branch of government? Yes or no? No, they are not. Okay, thank you. Counsel, how are prosecutions under this provision initiated? If there was to be a prosecution, it would have to be a referral from the Office of Administrative Hearings to a county attorney. And I'll point out, since 2004, in the 10 years after Minnesota switched to the Office of Administrative Hearings, there have been no prosecutions. There have been none. Hypothetically, could anyone file a claim that a group or an individual has violated the act, and to whom would they file it? They would file that with the Office of Administrative Hearings. That would do a review of it to see if it met a prima facie standard, and if so, then it would proceed to a hearing. And if they found that there was a violation, they have the ability to determine whether or not they would fine the person and or refer it to for criminal prosecution. Now, are there any negative consequences, such as potential fines or other repercussions for an individual filing a false allegation of violation? There are. The Office of Administrative Hearings has the ability to find a complaint that's frivolous and to award the opposing side their costs and attorney's fees. They're a speech court. This is a speech court in the state of Minnesota, correct? It's the Office of Administrative Hearings. It is a speech court, the way you've defined it, right? They're defining what's speech and what's a frivolous complaint and what's truth in a campaign. They're determining whether or not somebody has met the standard. And you argue strict scrutiny doesn't apply to this law? That's correct, Your Honor. Intermediate scrutiny applies. Justice Breyer's opinion in Alvarez is the controlling opinion, as you pointed out. It's concurring in judgment. His is the linchpin that gets you to the judgment, which was to strike down the Stolen Valor Act. The narrowest holding in that case, then, is Justice Breyer's. Counsel, do you believe this law could be adopted by the federal government and they could set up an administrative agency appointed by the president and the executive branch to referee the presidential contest as to actually false statements, swift boat veterans and everything else that happens? Willie Horton adds, can they do that? Yes, Your Honor. Okay, thank you. There's judicial review. Thank you. Yes, Your Honor. Has there ever been any—you're talking about a compelling state interest. At the time of adoption of this or any predecessor, has there ever been any showing, any evidence that these people, that this is a compelling state interest to do this? In other words, that outcomes have just required— Your Honor, there are cases where courts in Minnesota have found that there were very close elections and determined that the statements likely had an impact. How likely? For a compelling state interest, there has to be a pretty firm showing, doesn't there? There does. For a compelling state interest, yes, Your Honor. Well, and you're depending upon a compelling state interest in your argument here, right? Your Honor, we're arguing that it's under intermediate scrutiny, but that it also does satisfy strict scrutiny, as the district court found. And to prove a compelling state interest, we believe that the democratic institution of having people vote on ballot initiatives is important enough that it satisfies the— You believe that, but is there any showing? But even for an intermediate scrutiny, there has to be a state interest of some sort involved, right? Yes, Your Honor. And there has to be a showing that—and there needs to be a remedy. And you've said, well, there's some cases that show that maybe the outcome of an election— Well, I— I suppose you could do that with any election. Your Honor, as the district court pointed out, it's near impossible to show, because we have ballots that are sealed, to determine whether or not a particular false statement had a particular influence on a voter and flipped an election. Counsel, have you heard of this science called political science, where there are experts who come to our courts in reapportionment cases and testify to those very facts? Yes, Your Honor. This statute was passed in—the first one was passed in 1893. The ballot part of this was added in 1913. It's been in Minnesota for 100 years. It's been something that's been litigated on a number of times. The State v. Jude case was the case that made the Times v. Sullivan standard of actual malice to narrowly tailor this law towards—to make sure that it gave the proper breathing space so that we were able to have it survive. So I see that my time's just about up. I just want to close by quoting. I think a lot of this has dealt with the political arena and speech, and I think the Garrison case from the Supreme Court, Justice Brennan's opinion, speaks eloquently to this. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use deliberate or reckless lies and falsehoods as an effective political tool to unseat a public servant. That speech is used for a tool for political ends, doesn't automatically bring it under the mantle of the Constitution. For the use of a known lie as a tool is at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. In accord with Garrison, we ask this court to affirm the district court. Thank you. Thank you, counsel. The court thanks both parties for—I'm sorry. We have— Mr. Geary. Mr. Geary. I guess he sounded too much like a closing. We have a— Mr. Geary has— I'm sorry. Mr. Geary has— We have a second appellee. Okay. I apologize to both sides here. You sounded too much like a closing. I thought we were just about done. I apologize. Thank you. Good morning. My name is John Geary. I represent the appellee, Minnesota Attorney General. The 11th Amendment issue before the court now is not the one that's been previously decided, which is whether the attorney general is a potentially proper defendant such that she can be named in the complaint and have that survival motion to dismiss. The question now is whether in the event plaintiffs prevail on the merits of their constitutional claim, whether injunctive and declaratory relief can be entered against the attorney general in addition to the county attorneys. This court's decision in the reproductive health case from 2005 controls that question. That case held under factual circumstances that are indistinguishable from those here that the 11th Amendment did not permit injunctive relief to be entered against the Missouri Attorney General in addition to the local prosecutors because although there was a sufficient connection between the attorney general's office and the challenged criminal statute to make the attorney general a potentially proper defendant, as here, the injunctive relief could not be extended to the attorney general because there was no threat and enforcement of the statute. That is to say, the authority that existed for the attorney general to enforce the statute, there was no showing that it was going to be actually used. And the circumstances as to that are indistinguishable from those here. In reproductive health, the Missouri Attorney General could, I'm sorry. Was that case after our previous decision in this case? No, no. The reproductive health is at 428. But what year was it? 2005. So it was definitely before our previous decision. Yes, it was. And it was referenced in your previous decision for the proposition that as in that case, the Minnesota Attorney General here was a potentially proper defendant such that a motion to dismiss her based on the 11th Amendment can be denied. But the question now is different. Can relief be ordered against her, injunctive and declaratory relief, or does the 11th Amendment prevent that? And in the reproductive health case, this court said the injunctive relief could not be entered against the Missouri Attorney General because as here, his office could enforce the statute only at the request of other government officials, and there have been no such requests made. The same is true here. There's nothing in the record to show that a request by county attorneys for the Attorney General's office to enforce the statute has ever been made, much less accepted, or ever would be made. I would briefly point out that the two ways in which appellants try to distinguish reproductive health at pages 39 and 40 of their reply brief fail. This was not a Rule 65 ruling. On this issue, this court ruled explicitly based on the 11th Amendment, and contrary to their footnote, the Missouri Attorney General, on remand from that decision, did not remain a defendant for purposes of a relief being entered against him. Rather, the case was dismissed on remand at the motion of the plaintiff. I see my time is up, and I thank the court for its time. Thank you, Mr. Geary. Mr. Moorman. Thank you. I'm sorry for the confusion. No, it was on me. I want to get to the county attorney's last argument, that magnificent closing argument that they enunciated from the Garrison case. The problem with that argument, of course, is Justice Kennedy, in the plurality decision in Alvarez, specifically discussed that statement. And after quoting Garrison, Justice Kennedy said, these quotations all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or the cost of vexation litigation. In those decisions, the falsity of the speech at issue was not irrelevant to our analysis, but neither was it determinative. The court has never endorsed the categorical rule the government advances that false statements receive no First Amendment protection. So that may have been a great flowery speech from Justice Brennan, but it's irrelevant to the issues here. I think there's a holding of the case in Garrison. Go ahead. What's that? Wasn't it the holding of the case in Garrison? They approved that criminal libel statute in Louisiana. Go ahead. Yeah, that's right, they did. But criminal libel is different than here, as this court has already recognized. We're dealing with ballot questions, which aren't subject to a defamation analysis. Secondly, under strict scrutiny, and even under intermediate scrutiny to an extent, the state has to have some evidence to support its interests, and they have none. Mr. Gary got up and said there have been situations where elections in Minnesota have the result has changed because of false speech. Where? I don't see it in the record, and that's the number one issue for them. You'd think it would be in their papers. I've lived in this state for 28 years. I don't remember a case, any election, where somebody after the election, mass groups of voters have said, wow, we didn't realize that that statement that was made prior to the election was false, and that caused us to change our vote. There's no evidence of that, and as Your Honor pointed out, that's what political scientists do. They can analyze these elections and make that argument. And the problem then with the regulation is, if it isn't serving the compelling interest Minnesota has in making sure that elections aren't tainted by fraud with the voters, which another point I wanted to make, in the Anderson v. Celebreze case, the Supreme Court noted when a similar argument was made, the Supreme Court said our citizens are made of sturdier stuff. Our citizens can figure out if there are lies being made during an election campaign and can inform themselves of what's happening. So the respondents don't have any evidence, actual evidence that they have to have under strict scrutiny to support this. The effect of a ballot question, that is necessarily an opinion of what would happen in the future. And my client, Joel Broody, provided a declaration in this case that because this case has been pending for five years, works very well in our favor. When Joel Broody first commenced this case, he had made a statement against a school bond. There was a school bond that was going to be in effect for five years. He made a statement and said, no, these people that are proposing this, they're going to make this permanent. And the proponents came out and said that Joel was lying and threatened to take action against him under the Fair Campaign Practices Act. Well, guess what? Five years later, the school board down in Lake Welcome, Minnesota, went to make that five-year increase permanent. That's the problem with this. There are lots of situations where people will make campaign speech saying something's going to happen in the future. They'll claim it's a lie, try to drag you into these proceedings, and it'll turn out that their statements that are supposedly lies turn out to be true in the future. I'm out of time. I would ask that this court reverse the judgment of the district court and remand with an order for the district court to enter judgment in favor of the appellants on their motion for summary judgment. Thank you. Thank you, Mr. Mormon. Thank you also, Messrs. Rogan and Gary. And we appreciate your presence and argument this morning. Please consider your case submitted. We'll render a decision in due course. Thank you.